## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BOBBIE MCNEILL                                    *

    Plaintiff,                                 *

v.                                                *        CASE NO.:  WDQ-10-0029

OFFICER WEAVER, et al.                            *

    Defendants.                                *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

    Defendants, Officer Louis Weaver, Officer Brendan Duker, Officer Mark Grelak, Officer Adrienne Grant, and Officer Nicholas Mabry, in accordance with the Court's request, respectfully submit the following Proposed Findings of Fact and Conclusions of Law to aid the Court in complying with Fed. R. Civ. P. 52(a)(1) ("the court must find the facts specially and state its conclusions of law separately").

    This submission consists of four parts:

| A. | Introduction and Procedural History | 2 |
| B. | Proposed Findings of Fact | 5 |
| C. | Applicable Law | 49 |
| D. | Proposed Conclusions of Law | 53 |

## A.    INTRODUCTION AND PROCEDURAL HISTORY

On January 6, 2010, Bobbie McNeill, Jr. (Mr. McNeill) filed a Complaint against the Baltimore County Police Department and six Baltimore County Police Officers.  He also filed a Motion for Leave to Proceed *in forma pauperis*, which was granted on January 27, 2010 (Document 5).

On March 30, 2010, Defendants filed a Motion to Dismiss or for Summary Judgment (Document 6).  In a Memorandum and Order dated July 20, 2010 (Documents 8 and 9), the Court granted in part and denied in part the Defendants' Motion to Dismiss or for Summary Judgment.  The Court dismissed the Complaint against Defendant Baltimore County Police Department, denied the Motion with respect to judicial estoppel, and gave the Defendants sixty days to file supplemental responses.

On November 18, 2010, the Court denied the Plaintiff's Motion for Demand for a Jury Trial (Document 23).

There were a number of motions filed in connection with the appointment of counsel for the Plaintiff.  Ultimately, on March 23, 2011, the Court entered an order appointing Peter Coleman as *pro bono* counsel to represent Mr. McNeill (Document 46).  Mr. Coleman entered his appearance on May 5, 2011 (Document 50).  The Second Amended Complaint was filed on May 11, 2011 (Document 55).  The Court entered a Scheduling Order on June 1, 2011 (Document 61).  The case

was referred to Magistrate Judge Paul W. Grimm on June 6, 2011 for discovery (Document 63).

On August 31, 2012, Defendants filed a Statement Noting Plaintiff's Death (Document 104). On September 28, 2012, Bobbie McNeill, Sr., as Personal Representative of the Estate of Bobbie McNeill, Jr., filed a Motion for Substitution of Parties (Document 108). Mr. Coleman also entered his appearance on behalf of the Estate on that same date (Document 109). On November 1, 2012, the Court granted the Motion for Substitution of Parties (Document 118) and on that same date granted the Estate's Motion to Amend the Complaint (Document 119).

On November 1, 2012, a Third Amended Complaint was filed by Bobbie McNeill, Sr., as Personal Representative of the Estate of Bobbie McNeill, Jr. (Document 120). The Third Amended Complaint alleged three causes of action: Count I (42 U.S.C. §1983 – Excessive Force); Count II (Battery); and Count III (Survival Action). Each of the three Counts requested the Court to award compensatory damages against each Defendant in the amount of $85,000.00 and punitive damages against each Defendant in the amount of $255,000.00.

On November 5, 2012, the Defendants filed Motions in Limine (1) to exclude the testimony of Dr. Ashok Krishnaswamy as to the cause of Mr. McNeill's knee injury since the doctor was "not sure" of the cause of the injury; (2) to allow the reading of the deposition of Officer Grelak who was unavailable

because of military service; and (3) to preclude any attempt by Plaintiff's counsel to inquire about any other internal affairs complaints against the officers in accordance with Judge Grimm's letter Order of December 15, 2011 (Document 122).   On November 9, 2012, the Defendants' filed their Answer to the Third Amended Complaint (Document 128).

On November 13, 2012, the parties filed their Proposed Pretrial Order (Document 129).

A three-day court trial commenced on November 13, 2012.   The Plaintiff called the following witnesses:

> Bobbie McNeill, Sr.
> Excerpts of Deposition of Bobbie McNeill, Jr.
> Dr. Jonathan Arden
> Dr. Ashok Krishnaswamy
> Officers Grant, Mabry, Hays, Weaver and Duker

> The Defendants called the following witnesses:

> Officer Grant
> Kevin Seglinski
> Robert Raynor
> Sgt. Raymond Mullaney
> Deposition of Mark Grelak
> Officers Nicholas Mabry, Louis Weaver, Brendan Duker, Tabitha Hays
> Video Deposition of Dr. Kenneth Tepper
> Video Deposition of Dr. David Fowler

> The Plaintiff called the following rebuttal witness:

> Officer Grant

At the conclusion of the trial, the Court requested the parties to order the transcript and to submit Proposed Findings of Fact and Conclusions of Law. The parties agreed that such submissions would be made simultaneously on March 11, 2013.

## B.    PROPOSED FINDINGS OF FACT

### Introductory Factual Summary

Bobbie McNeill, Jr. fled from a traffic stop and led the police on a vehicular chase through a residential section of Dundalk. He eventually bailed out of his car and twisted his knee, by his own admission, he "came to a stop, got out of the car and twisted my knee when I got out". That twisting explains the injury that the Plaintiff now attributes to Mr. McNeill being kicked in the knee by Officer Duker. Dr. Tepper, an orthopedic surgeon confirmed in his videotape testimony that Mr. McNeill's knee injury occurred when he jumped out of his father's vehicle.

Mr. McNeill ran down the alley. Officer Grant caught him. Mr. McNeill grabbed on to a chain link fence with both hands and would not let go. Officers Grant, Mabry and Grelak attempted to pull Mr. McNeill off the fence. He eventually came off the fence and his face hit the concrete alley, making a clunking sound like a watermelon. This explains the cut above Mr. McNeill's right eye and the facial abrasions on his right face. Dr. David Fowler, the State Medical Examiner, confirmed this forensically in his videotaped testimony.

Mr. McNeill continued to struggle. Officer Duker placed his knee near Mr. McNeill's back shoulder so he could be cuffed. Officer Weaver cuffed Mr. McNeill, using his own cuffs. Officer Tabitha Hays took hold of McNeill as he was being walked back to the patrol vehicle. McNeill continued to struggle. By McNeill's own admission, he "hit the frame of the police car with the back of my head" as he was being placed, back first, into the vehicle. This explains the small cut on the top of McNeill's head. Dr. David Fowler, the State Medical Examiner, confirmed this forensically in his videotaped testimony. Dr. Arden, Mr. McNeill's forensic expert, testified to a non-existent injury to the left parietal area of the head.

McNeill had to be transported in a prisoner transport vehicle, because of the way he was acting.   He claimed (falsely) that he was having chest pains. He was taken to Franklin Square Hospital. He was demanding Percocet and Xanax.  He told the ER doctor that "if I can't get my Xanax then I am hearing voices and suicidal" (Defendants' Exhibit 7, at P00003).

Mr. McNeill was returned to the precinct for processing. In conversation with Officer Grant, he threatened to sue the County, claiming he would get a settlement. Pointing to his right eye, he said that "this is my payday" or words to that effect.

Mr. McNeill pled guilty to second degree assault and was sentenced to serve 10 years, with all but 4 years suspended.

While incarcerated, Mr. McNeill obtained the assistance of a jail house lawyer and filed this lawsuit. He also filed a second lawsuit in this Court against various state officials related to alleged negligent medical care of an alleged re-injury of his left knee following surgery on that knee while he was incarcerated. *Bobbie McNeill v. Warden John Wolfe*, Civil No. WDQ-10-3116. This Court dismissed that action on October 19, 2011.

After the instant suit was filed, Defendants moved for summary judgment under the doctrines of judicial estoppel and qualified immunity. The Court denied the Motion.

Since McNeill is deceased, the Court was not able to judge his credibility first hand.  However, he was not a credible individual, as will be shown by the numerous contradictory and manipulative statements he made and his lengthy criminal history (Defendants' Ex. 50).

## Officer Adrienne Grant

### The Stop

1.    On January 16, 2009 at approximately 2125 hours (9:25 p.m.), Officer Adrienne Grant (now Detective Grant) was on routine patrol in marked unit 1212 traveling southbound along the east alley of Yorkway in Dundalk, MD, 21222 (Direct Examination of Officer Adrienne Grant, November 14, 2012, at T. 18-20).

2.      Officer Grant observed Bobbie McNeill's father's vehicle stopped in an alley behind a known drug house, where an individual is known to sell prescription drugs and "fence" property.  The vehicle was a green Lincoln. The passenger in the vehicle (later identified as Kevin Seglinski) got out of the vehicle, went into the house, a short time later came out of the house, and got back into the vehicle. (*Id.* at T. 19-20).

3.      The vehicle approached the intersection of Mornington Road, which is one way, and made a left turn traveling in the wrong direction (*Id.* at T. 21).

4.      Officer Grant followed the vehicle and shortly thereafter initiated a lawful traffic stop using her emergency lights and siren (*Id*. at T. 21-22).

5.      Upon approaching the vehicle, Officer Grant recognized the operator to be Mr. Bobbie (NMN) McNeill Jr. through prior police contact and she thought his license was suspended (*Id.* at T. 22).

6.      Seated in the passenger seat was Mr. Kevin Matthew Seglinski. Officer Grant recognized the name Seglinski to be that of a suspect in a fraud and theft investigation conducted by Officer Nick Mabry earlier in the day (*Id.* at T. 23).

7.      Mr. McNeill advised he did not have a valid driver's license (*Id.* at T. 22-23).

8.     Officer Grant asked Dispatch for a backup officer (*Id.* at T. 23). Officer Mark Grelak arrived at the scene (*Id.* at T. 25).

## The Vehicular Pursuit

9.     Dispatch advised that Mr. McNeill had an open warrant. Mr. McNeill heard this and immediately shifted his vehicle into drive and took off (*Id.* at T. 25).

10.     Officer Grelak and Officer Grant returned to their vehicles, notified a supervisor of the incident and began a pursuit of Mr. McNeill in his vehicle (*Id.* at T. 22-26).

11.     Officer Brendan Duker was staged at the intersection of Moorgate Road and Ormand Road facing toward Merritt Blvd.   This position exposed his driver side door to the oncoming vehicle. He realized that McNeill's vehicle was traveling toward his driver's door. He quickly accelerated to avoid Mr. McNeill's vehicle from striking his vehicle (Direct Examination of Officer Brendan Duker, November 14, 2012, at T. 230-231).

12.     The pursuit continued to Church Road and Kavanagh Road.   At Kavanagh Road, Mr. McNeill turned right and stopped his vehicle at an intersecting alley.   Officer Grant pulled up right behind him (Direct Examination of Officer Adrienne Grant, November 14, 2012, at T. 33).

13.     The recordings and transcripts (Defendants' Exhibit 8) of the Precinct 12 main channel and tactical channel were admitted into evidence and, as

explained by Officer Grant, corroborated her testimony and the testimony of the other Officers concerning the stop, pursuit and arrest of Mr. McNeill (*Id*. at 38-53 and 57-83).

### The Foot Pursuit and Arrest

14.     Mr. McNeill jumped out of his vehicle and ran between the front of Officer Grant's patrol vehicle and the rear of his vehicle. He fled on foot down the alley (Direct Examination of Officer Adrienne Grant, November 14, 2012, at T. 88-89).

15.     The passenger in Mr. McNeill's vehicle, Mr. Seglinski, exited and raised his hands in the air. (See Kevin Seglinski testimony below).

16.     Officer Grant ran and chased Mr. McNeill, yelling at him to get on the ground, stop, you are under arrest (*Id*. at T. 91). She gained on him toward the end of the alley where it begins to turn and managed to grab either part of his shirt or sweater. She continued to yell commands – get on the ground, stop, you are under arrest (T. 92). He tried to push her away from him and as she was pulling on his sweatshirt, she injured her wrist (T. 92).

17.     He then grabbed on to the fence that was shown on photographs previously introduced into evidence (T. 92-93 and Defendants' Exhibits 4a & 4b). Defense Exhibit 4.1 depicted the alley and the fence that Mr. McNeill grabbed onto.

18.    She was pulling on him when Officer Grelak arrived to assist (T. 93).

19.    Mr. McNeill was screaming profanity saying "fuck you, get off of me, fuck you" over and over (T. 94).  She looked over and Officer Grelak had grabbed his other arm and was also trying to get him off the fence (T. 95).  Officer Mabry arrived and he and Officer Grelak were to the right side of Mr. McNeill and Officer Grant was on the left side (T. 95).  They were pulling and all came suddenly back very forcefully and went to the ground (T. 96).  Officer Grant heard the sound of Mr. McNeill's head hitting the alley like a watermelon.  It was very loud (T. 96).  She had stated to Internal Affairs that she heard the clunking sound like a watermelon (T. 97).

20.    Officer Grant's head hit the alley as well, but she did not hit as hard as Mr. McNeill, as the impact was cushioned by her "police beanie cap" (T. 97). As she fell to the ground, she felt her arm twinge again (T. 98).

21.    She then saw black shiny liquid which she knew was blood and told the other officers to watch out (T. 99).

22.    Mr. McNeill was still kicking his legs (T. 99).   He was just "flopping."  Officer Grelak was on one side, Officer Mabry was on the other side. Mr. McNeill's arms were underneath of him.  Officer Weaver had arrived and took a position kind of straddling him, sitting on his back (T. 100).

23.    Officer Weaver eventually cuffed Mr. McNeill (T. 101).

24.    Mr. McNeill stood up, looked around and was pretty much calmed down (T. 102).  Officer Grant took him part of the way down the alley and at some point Officer Hayes came up and took custody of Mr. McNeill (T. 103).  Officer Mabry took Mr. Seglinski in custody (T. 103).  Officer Grant saw that Officer Duker was there, but did not remember him being part of the arrest at all (T. 104).

25.    As they came down the alley, Mr. McNeill saw a few civilians and started screaming and yelling again, "fuck you, get off of me", apparently just to cause a public commotion (T. 105).

26.    With regard to Mr. McNeill's allegation that Officer Grant had cuffed him, "that is absolutely not true. Officer Weaver placed the handcuffs on Bobbie McNeill" (T. 106).

27.    This is confirmed in the radio transmissions in which you can hear Officer Weaver asking dispatch to ask the driver of the wagon about the handcuffs and the wagon says basically in response they "Will be in the processing area" (T. 106 and Defendants' Exhibit 8 at page 10, lines 4-7).

28.    With regard to the allegations that Officer Duker punched Mr. McNeill in the eye three times, that is completely untrue and absolutely did not happen (T. 106).  Officer Duker did not kick Mr. McNeill, in fact Officer Grant did not even know Dr. Duker was there (T. 107).  She did not see any officer punch or

kick Bobbie McNeill that evening (T. 108). She did not see Mr. McNeill hit his head when he was being placed into the patrol vehicle (T. 109).

29.    Back at the Precinct, Officer Grant began to complete multiple forms regarding the vehicle pursuit and arrest (T. 134). Someone handed her the antenna from her vehicle which Mr. McNeill had broken off (T. 135).

30.    At some point, Mr. McNeill was returned from Franklin Square Hospital and she saw him in the processing area (T. 135). He started laughing, kind of laughing and joking. Officer Grant said that it was not funny and was dangerous. His attitude changed, he seemed to be nastier. He then started cursing "fuck you" and he started pointing to his head, saying "this is my fucking payday" (T. 138). He made a comment that he knew how it worked, he sues the County, the County pays, meaning all he has to do is say something and they are going to settle with him (T. 138).

31.    Officer Grant was surprised when she was served with the lawsuit because it was completely unfounded. Nothing happened to him, he was not kicked and he knew it. She was mad. It was upsetting (T. 141-142).

### Officer Mark Grelak

32.    Officer Mark Grelak testified by deposition, since he was overseas on military duty. He recalled that Mr. McNeill had latched onto the fence. Officer Grant was on one side, and he was on the other side. They were trying to pull him

off at which point, Officer Mabry came up behind. Eventually, Officer Weaver placed him in handcuffs (Deposition Testimony of Officer Mark Grelak, November 14, 2012, at 207).

33.    He assumed Mr. NcNeill's head hit the ground. It was a loud noise. At that point he was face down, still resisting and they were struggling to get his arms behind his back (Id. at 208).

### Officer Nicolas Mabry

34.    Officer Nicolas Mabry had been with the Police Department for ten years at Northpoint Station. He assisted with apprehending Bobbie McNeill. He was behind Officer Grelak in his patrol vehicle (Direct Examination of Officer Nicolas Mabry, November 14, 2012, at T.213).

35.    He was grabbing Mr. McNeill on the same side as Officer Grelak (T. 216). Mr. McNeill's head made contact with the ground. It was a thud consistent with someone's head hitting the ground (T. 217). At that point, Mr. McNeill continued to resist arrest like "like he was putting on a show for someone" (T. 217). After the arrest of Mr. McNeill, he found Mr. Seglinski next to the vehicle (T. 219). He had been looking for Mr. McNeill in reference to a fraud earlier that evening (T. 219). He did not see any Officer punch or kick Mr. McNeill (T. 220).

### Officer Louis Weaver

36.    Officer Weaver has been a Baltimore County Police Officer for over six years (Direct Examination of Louis Weaver, November 14, 2012 at T. 221).

37.    He went down the alley, turned a small left and observed Officer Grant, Grelak, Mabry and Mabry struggling with Mr. McNeill against the chain-link fence that he was holding onto (T. 225).  Eventually, they all went to the ground.  It was a hard fall.  McNeill was actively resisting arrest, kicking, yelling profanities, keeping his arms underneath of him (T. 226).

38.    Officer Weaver took his handcuffs out and placed them on Mr. McNeill.  He handed Mr. McNeill off to Officer Hays who walked him back to Officer Grant's police vehicle.  He heard Mr. McNeill acting out at the rear of the police vehicle (T. 226).  He asked on the radio to get his handcuffs back.  He did not want to lose them.  He did not see anyone punch or kick Mr. McNeill (T. 227).

**Officer Brendan Duker**

39.    Officer Duker has been a Baltimore County Police Officer for seven and one-half years (Direct Examination of Brendan Duker, November 14, 2012 at T. 228).

40.    He was staged at the intersection of Moregate Road and Ormond Road during the vehicular chase.  He realized that Mr. McNeill's vehicle left its lane of travel and was traveling toward Officer Duker's driver side door.  He accelerated to avoid Mr. McNeill's vehicle striking his vehicle (T. 231).

41.    When he arrived in the alley, he observed "a big pile" with several officers already on top of Mr. McNeill attempting to restrain him.  He placed his knee on Mr. McNeill's back and shoulder to attempt to apply pressure to keep him from flailing around and to assist with the apprehension (T. 232).  Eventually, McNeill was placed in handcuffs.

42.    Officer Duker was not involved in placing Mr. McNeill in the patrol vehicle.

43.    Officer Duker never punched, struck or kicked Mr. McNeill nor did he see any other officer kick, punch, strike or any other way to inflict violence upon Mr. McNeill.  He did not push Mr. McNeill into the frame of the patrol vehicle, or kick Mr. McNeill in the knee when he was being placed in the patrol vehicle.  He was not involved in placing Mr. McNeill in the patrol vehicle (T. 235).  After Mr. McNeill was arrested, Officer Duker left to assist in a narcotics investigation (T. 236).

44.    When Officer Duker returned to the precinct, Mr. McNeill was walking from the sally port into the processing area.  He stopped for a minute, looked at Officer Duker's nametag and stated that Officer Duker was the one who had kicked his ass or something to that effect.  He clearly read Officer Duker's nametag and made allegations that Officer Duker assaulted him in some way.  As

for Mr. McNeill's testimony that he asked Officer Duker for his name "that did not happen" (T. 237-238).

## Officer Tabitha Hays

45.    Officer Hays had been an officer since June of 2005 (Direct Examination of Officer Tabitha Hays, November 14, 2012 at T. 239).

46.    When she arrived, the other officers had already detained Mr. McNeill and were walking him out of the mouth of the alley.  She moved in to walk Mr. McNeill to a patrol car to give the other officers a break (T. 241).

47.    As Mr. McNeill was resisting her, she received a scratch on her knuckle from his fingernail (T. 243).  He was actively resisting the whole time, yelling and screaming.  At some point the antenna on the vehicle was broken off. Other officers moved in to help her (T. 245).  He was fighting the entire time.  He would not go into the vehicle.  He would not comply with anything they were telling him to do (T. 246).  At no time did she see any officer punch or kick Mr. McNeill (T. 247).

## Kevin Seglinski

48.    Kevin Seglinski and Bobbie McNeill were best friends since they were thirteen years old (Direct Examination of Kevin Seglinski, November 14, 2012, at T. 112)

49.    Mr. Seglinski hung out with Mr. McNeill on January 16, 2009, (*Id*. at T. 112).  They were drinking throughout the day (T. 113).  They went up to the strip clubs around 11:00-12:00, had a couple of drinks and left (T. 114).

50.    They went back to McNeill's house and had a couple of beers and then called some girls.  They also smoked some marijuana (T. 115-116).

51.    Mr. Seglinski was intoxicated.  Mr. McNeill had been drinking the same amount of alcohol as Mr. Seglinski (T. 116).

52.    When Mr. McNeill took off after being stopped by Officer Grant, Mr. Seglinski told Mr. McNeill to stop.  He put his hands up and said stop the car (T. 118).  Mr. McNeill responded, "I'm not going to jail" (T. 119).  When McNeill pulled up to the alley, he opened the door, got out and began to try and run (T. 119).

53.    Mr. Seglinski did not see any police officers strike Mr. McNeill with their fist, kick Mr. McNeill with their foot, or inflict any physical punishment or injury upon Mr. McNeill. When Mr. McNeill fell to the ground, he was trying to get back up or whatever and they got on top of him to cuff him (T. 120-121).  He did not see any police officer hit Mr. McNeill with their fist or kick them with their foot that evening (T. 121).

54.    Prior to his death, Mr. McNeill approached Mr. Seglinski about testifying in this case (T. 123).  Mr. McNeill told Mr. Seglinski "me, you, and my

lawyer will sit down, he will go over what to say and will tell you, you know, everything you have to say and what you can say you plead the Fifth to or you don't have to answer" (T. 127).   Mr. McNeill asked Mr. Seglinski to testify differently from what he testified to under oath in Court on November 14, 2012 (T. 128).

55.     Mr. McNeill was arrested on September 26, 2009, four days before he pled guilty to the charge of second degree assault from the January 16, 2009 incident (T. 131).  He and Mr. McNeill were once again in Mr. McNeill's father's vehicle.  Mr. McNeill went through an intersection and took out a light post.  The police took Mr. McNeill out of the car and locked him up (T. 131-132).

### Guilty Plea

56.     Mr. McNeill pled guilty to Second Degree Assault in the Circuit Court for Baltimore County. Following the entry of his guilty plea, the Assistant State's Attorney recited the facts which formed the basis for the guilty plea.  These facts included McNeill's fleeing from police in his car and then fleeing from the police on foot.  Further, McNeill then was caught by the police officers and he grabbed onto a chain link fence and refused to let go so the officers could place him in handcuffs and effectuate his arrest:

> Ultimately, about five miles into the chase the defendant turned on a roadway that had an alley.  The defendant turned into the alley abandoning his car and blocking the

alley from the police cars.  He then got out on foot and a chase ensued.

Three officers, one of whom was Officer Grant, who was the first officer.  She advised that was the defendant.  As he was running, she was able to grab his shirt.  She fell as she grabbed his shirt.  She hyper extended her wrist, but she was not able to stop the defendant.

He was ultimately able to get to a chain link fence, and he grabbed onto the fence.  It took three officers to try and remove him from the fence.  Ultimately, they were able to get him off the fence, but everyone fell, including the defendant and all three officers.

Officer Grant would testify at that time she did hear the defendant hit his head.  The defendant continued to resist arrest.  He continued to use profanity.  "Fuck you," like that language.

Ultimately, he was arrested.  He was taken back to Officer Grant's patrol car.  Even at that point he continued to resist arrest.  He broke the antenna off her patrol car.

(Defendants' Exhibit 1, page 12)

57.    As the Assistant State's Attorney later said:

"He was hurt that night because he resisted arrest; not because the officers hurt him but because they had to pull him off the fence, and he fell and hit his head.

(*Id*. at page 17, line 24 to page 18, line 2).

58.    Mr. McNeill's only comments with respect to the recitation of facts were as follows:

> "Sir, it's probably the worst ten minutes in my life. I apologize for all parties involved, the police, my family and the Court. It happened in ten minutes and I apologize."

(*Id*. at page 16, lines 13-16).

59.    Judge Patrick Stringer sentenced Mr. McNeill to 10 years, with 6 years suspended and 2 years probation upon release, with the condition of counseling for McNeill's "mental health issues."

## Internal Affairs Investigation- Sgt. Raymond Mullaney

60.    Mr. McNeill filed a complaint with Internal Affairs. The initial complaint named only Officer Duker. After a thorough investigation, the charges against all six (6) officers were determined to be "unfounded."

61.    Sergeant Raymond Mullaney was the primary investigator of Mr. McNeill's Internal Affairs Complaint (Direct examination of Sergeant Raymond Mullaney, November 14, 2012 at T. 156).

62.    He was assigned the case on March 9, 2009 (T. 157).  He was asked about Defendants' Exhibit 6, the Internal Affairs Case Book (T. 157).  Mr. McNeill submitted a notarized form 116, Complaint of Retaliation Alleged Against an Officer (T. 159).  It is notarized on pages 83 and 84 (T. 160).  It was notarized on February 13, 2009 (T. 162).  See Defendants' Exhibit 6 at A-2 to A-6.

63.     The case was assigned to Sergeant Mullaney on March 12, 2009 (T. 163).

64.     Sergeant Mullaney did not locate any witnesses that actually saw the physical apprehension of Mr. McNeill.  He located two witnesses that saw Mr. McNeill already in handcuffs being walked to the police car (T. 165).

65.     Kevin Seglinski declined to be interviewed by Internal Affairs (T. 165).

66.     Mr. McNeill called Sergeant Mullaney during the investigation and alleged that while he, Mr. McNeill, was in Court on June 9, 2009, the Officers involved in the case were laughing at him during the Court proceedings (T. 167).

67.     Sergeant Mullaney had attended the proceedings and had seen Officers Grant, Mabry and Duker in the courtroom seated in the jury box in front of him.  He did not witness them ever looking at Bobbie McNeill at any time other than an occasional glance (T. 167).  He told this to Mr. McNeill, who seemed a little shocked and wasn't aware that Sergeant Mullaney was in the courtroom (T. 167-168).

68.     Baltimore County Police Department Notification of Investigation Form 259 orders officers not to discuss any aspects of the Internal Affairs Investigation with any other member of the Department (T. 169-71).

69.    Baltimore County Police Department's posture on integrity violations has typically been termination (T. 172).

70.    On page A. 9 of the Internal Affairs Case Book, there was an injury diagram completed by Mr. McNeill (T. 173). There was an (X) over the right eye, an (X) over the left knee, and an (X) through the right eye. Each of the (Xs) is initialed by Mr. McNeill (T. 174). There was no indication on the diagram of injury to the left side of Mr. McNeill's head (Defendants' Exhibit 6 at A-9).

71.    The diagram at page A. 10 of the report shows an (X) through the right eye, an (X) on the head off the right eye, an (X) through the right eye, an (X) near the right eyebrow and an (X) on the right side of the head, initialed by Bobbie McNeill (T. 174). There were no (Xs) or marks on the left side of the head (T. 174). These are the only injuries that Mr. McNeill indicated that he had received as a result of his Complaint according to the injury diagram (T. 175) (Defendants' Exhibit 6 at A-10).

72.    Mr. McNeill had complained to Internal Affairs that he surrendered to Officer Grant and allowed her to place handcuffs on him (T. 176).

73.    Radio transmissions and interviews with the Officers contradicted that information, because Officer Weaver had requested over the radio that his hand cuffs be returned to him by the officer operating the prison transport wagon

(Defendants' Exhibit 8 at page 10, lines 4-7).  This indicated that Officer Weaver actually placed handcuffs on Mr. McNeill (T. 176).

74.    The Court noted that it heard the officer requesting that his handcuffs be returned indicating that Officer Weaver actually put the handcuffs on Mr. McNeill.  The Court noted that this was a reasonable sort of investigative finding (T. 177).

75.    Sergeant Mullaney interviewed all the accused officers (T. 183).

76.    He found two discrepancies in Mr. McNeill's Complaint.  One was the fact that Officer Grant did not place handcuffs on Bobbie McNeill, and in fact it was Officer Weaver who placed handcuffs on Bobbie McNeill (T. 184-185). The second discrepancy was Mr. McNeill's statement that he ran ten feet.  The location of the arrest was much farther down the alley – at least eighty feet at a minimum.  The arrest occurred at the "T" portion of the alley (T. 185).

77.    Mr. McNeill's statement that he "just gave up" does not make sense in light of his efforts to elude capture (T. 185).

78.    Baltimore County Detention Center Inmate Medical Report (Defendants' Ex. 6 at D-24) is a screening form that the Detention Center uses when it admits any inmate.  That form indicates "injury to right eye and left knee related to arrest" (Defendants' Exhibit 6 at D-24).  There was no indication of any

injury to the left side of Mr. McNeill's head (T. 187) ("Sutures right brow with abrasions, staple right scalp" (Defendants' Exhibit 6 at D-23).

79.    Mr. McNeill's "In Pursuit Data Sheet" documenting all of his police contacts totaled six pages (T. 49-53).

80.    Sergeant Mullaney found that the charges against Officers Duker, Grant, Maybry, Hayes, Grelak and Weaver were "unfounded."  This means that it did not happen the way it was reported by Mr. McNeill (T. 190-193).

**Robert Lee Rayner**

81.    Robert Rayner is a retired Baltimore County Police Officer (Direct Examination of Robert Rayner, November 14, 2012, at 54).  He was in the Baltimore County Police Department for 36 years and 9 months (*Id*. at 55).  He was a desk officer at Precinct 12 on the 10:00 a.m. to 6:00 p.m. shift.  *Id*.  He was interviewed by Internal Affairs in December of 2009 about giving out the name of an officer.  He said, "I don't do that"  *Id*. at 56.

82.    Officer Rayner did not tell Bobbie McNeill that Officer Duker was the one that caused his injuries. The statement that he made that he never gives this information out at any time was an accurate summary of what he told Internal Affairs (*Id*. 56).  He was shown page C-36 from Defendants" Exhibit 6, the Internal Affairs Case Book (*Id*. 56).

**Deposition Testimony of Bobbie McNeill, Jr.**

83.    Local Rule 106.2.k states that a proposed pretrial Order shall contain a list of the pages and/or lines of any portion of the deposition to be offered in a party's case in chief or any counter-designations under Fed. R. Civ. P. 32(a)(4)." Fed. R. Civ. P. 32(a)(4) states that a party may use for any purpose the deposition of a witness, whether or not a party, if the Court finds that the witness is dead.

84.    Counsel for the Plaintiff never provided a list of the portions of Bobbie McNeill, Jr.'s deposition to be offered in his case in chief (See Document 129, filed 11/13/2012).   Prior to the reading of excerpts from Mr. NcNeill's deposition, defense counsel noted that there had been no designations previously of the excerpts that Plaintiff's counsel intended to read, thereby denying the Defendants the opportunity to designate what they wanted to have read.

85.    This placed counsel for the Defendants in the position of having to read the entire deposition transcript, since there was insufficient opportunity to select specific excerpts in response to what had been read by the Plaintiff (Deposition Testimony of Bobbie McNeill, September 13, 2011, read at trial, November 13, 2012, trial transcript ("T") at 26-27.

86.    Plaintiff, Bobbie McNeill, Sr., read portions of Bobbie McNeill's February 10, 2009 Internal Affairs Interview.  Plaintiff's Exhibit 2, C-3 *et seq.* (T.

20).  Counsel for the defense noted that this interview was not subject to cross-examination (T. 21).

87.    Mr. McNeill described driving down an alley making a left on a one-way street, traveling about two miles and then being pulled over by Officer Grant (T. 22).

88.    After Officer Grant ran a warrant check, Mr. McNeill got scared and "took off."  He "came to a stop, got out of the car, and twisted my knee when I got out" (T. 23).  He initially claimed he ran about ten feet, fell to the ground, put his hands behind his back and then was handcuffed by Officer Grant (T. 23).  He then described being hit in the eye three times by Officer Duker.  He admitted that he hit the back of his head against the top of the police vehicle and fell into the seat.  He claimed that Officer Duker then kicked him four times in the knee (T. 23).

89.    After he had returned to Precinct 12, he claimed that the booking officer told him that it was Officer Duker who had battered him (T. 24).  This was subsequently and categorically refuted by retired Officer Robert Rayner.

90.    Both Mr. McNeill's Internal Affairs Interview and his deposition testimony were flatly contradicted by his initial Internal Affairs complaint of brutality (Defendant's Exhibit 6 at A2-A6 in which he placed all the blame for his injuries upon Officer Duker).  He claimed that all the damage and abuse he received from Officer Duker happened after he was handcuffed on the ground. *Id.*

at A6.  This statement was submitted under oath.  In his Internal Affairs statement and in his subsequent deposition testimony, Mr. McNeill tried to place some of the additional blame on the other officers.

91.    Mr. McNeill thought Officer Grelak was involved in kicking him in the head and punching him in the face but he didn't know (T. 32).  He thinks Officer Mabry was involved in kicking him in the head, splitting his head and punching him in the face, but he didn't know.  He knew for a fact that Officer Duker punched him in the face multiple times when he was handcuffed behind his back.  He asked Officer Duker his name, Officer Duker allegedly gave it to him (T. 33).

92.    When asked about the distance from his car to the point of  being handcuffed, he stated that it was probably like 32 or 50-80 feet.  "I said ten feet, but it could have been 20 feet or 30 feet.  It wasn't more than 80 feet" (T. 34).

93.    Counsel for the Defendants offered the deposition Exhibits which were attached to Mr. McNeill's deposition transcript (T. 36).  They were offered as Defendants' Exhibit No. 51.

94.    Mr. McNeill claimed he had a disability in his left knee but "I don't really know what caused it" (T. 40, 42).

95.    Mr. McNeill had been living with his parents for thirty-eight years and had been supported by them (T. 42).  His employment history was "off-and-on."

He never had a job other than working for his father's pest control company (T. 43).

96.    He sought Social Security Disability for "mental health" (T. 43).  He claimed to have had bi-polar disorder for probably ten years.  He was claiming social anxiety since 2009 (T. 46).  He was on various medications including depakote, lithium, alprazolam (T. 48-49).  He was arrested on September 26, 2009 for driving on a suspended license and for assault (T. 51).

97.    He entered a guilty plea in the Circuit Court on September 30, 2009 (T. 52).  On September 26, 2009, he was with Kevin Seglinski, the same individual he was with on January 16, 2009 (T. 53-54).  He claimed not to know who he allegedly assaulted on September 26, 2009 (T. 55-56).

98.    After his arrest on September 26, 2009, he claimed he was "hearing voices" and the police took him to Franklin Square Hospital, (T. 57-59).

99.    This is the same type of manipulation Mr. McNeill employed when he was arrested on January 16, 2009.  On that date, he claimed he was having "chest pains"  and was taken to Franklin Square Hospital.

100.    He sued the other officers because they were named on the charge papers, the statement of facts (T. 61).  He claimed the Officers were involved because they were watching the assault take place and not stopping it.  He received punches from certain ones but did not remember their names (T. 62).  He only

identified Officer Grant and Officer Duker (T. 63-64). Officer Grant did nothing except handcuff him and allow everything else to take place and did nothing to stop it (T. 64). He did not know what Officer Weaver did (T. 65). He did not know how Officer Hayes got a bloody knuckle (T. 66).

101. He pled guilty on September 30, 2009 to the charge arising out of the incident on January 16, 2009 "because I was guilty as the document says" (T. 74). He did not disagree with the statement of facts which was read by the State's Attorney (T. 76).

102. He served less than two years and was released on August 31, 2011 (T. 79).

103. The Internal Affairs Complaint which he signed was under oath (T. 160). He claimed that all the officer participated in the assault on January 16, 2009, but he only named Duker in his Internal Affairs Complaint of Brutality because it was the only name he knew at the time (T. 161).

104. He admitted that he had twisted his knee before the Officers ever arrived to arrest him (T. 165).

105. He had two surgeries while he was incarcerated in the Division of Corrections (T. 167).

106. He has been previously incarcerated three times with the State, DOC (T. 170). He did not know how many times he had been arrested (T. 197). When

asked about criminal convictions, he could not recall because of "mental health, memory, bi-polar – I can't remember every time I was arrested. I can't remember every time I was convicted and I can't remember every charge" (T. 200).

107.   He agreed he fled from the police and he agreed that he committed a second degree assault (T. 200-201).

108.   He did know what caused the ACL tear (T. 205). "I mean you got to ask a doctor" (T. 206).

109.   Because the claim for mental health issues had been withdrawn, counsel for the defense did not read that portion of the deposition (T. 206).

110.   The only bill he could reference was $271.00 which his parents paid to Dr. Ahn, a psychiatrist (T. 210).

111.   He discussed his suit against the Division of Corrections and numerous doctors complaining of the medical treatment he received while he was in the DOC (T. 213-214).

112.   He was a recovering drug addict and alcoholic. Cocaine was his drug addiction. He was a cocaine addict for ten years (T. 218). He admitted that he has stolen from people, but was not sure who they were. His cocaine addiction ended in 2008. He claimed that he didn't use drugs or alcohol anymore (T. 219). He previously took marijuana, cocaine and alcohol (T. 221).

113.   He admitted that he could have made the statement to Officer Grant "this is my fucking payday, I am going to sue everyone of you cops in Baltimore County.  I'm going to get my money" (T. 225).

114.   He admitted that he ran for a short period after he twisted his knee when he got out of the car (T. 230-231).

### Jonathan Arden, M.D.

115.   Dr. Jonathan Arden was accepted as an expert in the field of anatomic and forensic pathology (Direct Examination of Dr. Jonathan Arden, November 13, 2012, at (T. 88-89).

116.   He was asked to assess injuries to Mr. McNeill in light of varying explanations which were offered for the events that led to those injuries and to offer opinions, if he could, as to which accounts are consistent or inconsistent with those injuries as documented (*Id.* at T. 92).

117.   He identified three areas of injury on the head, including a third location of soft tissue swelling in the left parietal region as documented on the CT scan of the head (T. 109).  He felt that it was important to try to incorporate and account for all the evidence in terms of explaining how the injuries occurred (T. 110).

118.   All of the injuries are "generically blunt impact injuries" (T. 111).

119.    It was his opinion that the explanation or account offered by Mr. McNeill was consistent with looking at all of the injuries that he was discussing and assessing and that the other accounts as offered do not explain the totality of the evidence (T. 112).  "The parietal areas of scalp, if you were face down on the ground, are accessible to someone who is kicking at the head" (*Id*.).  That could easily explain both the bruising or the swelling as documented by CT scan on the left and the small lightly curved laceration on the right (T. 112).  The laceration on the right eyebrow area is a common injury for someone who gets punched in the face.  The abrasions on his face are also consistent with him having been face down and his face being scraped against the ground (T. 113).

120.    He then went on to say that certainly a substantial fall to the right side of the face could easily account for the laceration near the eyebrow and the areas of abrasion nearby.  That could all result from a single fall on a flat surface "but then that doesn't explain either of the parietal injuries" (T. 114).

121.    He did not disagree with Dr. Fowler's analysis of the cause of the injury to the right eyebrow.  "My disagreement is with his assessment that I think doesn't account for the entirety of the injuries" (T. 116).  Dr. Arden did not think that the injury to Mr. McNeill's right parietal area was caused by the frame of the vehicle doorway because the laceration was more curved than linear (T. 116-117).

He also claimed that Dr. Fowler did not account for the left parietal swelling as demonstrated in the CT scan taken that same day (T. 117).

122.  He agreed with Dr. Fowler that "one reasonable interpretation of the totality of the injuries just in the right eyebrow area is from a single contact with a hard flat surface" (Cross Examination of Dr. Jonathan Arden, November 13, 2012 at T. 131-132).

123.  He printed out the summaries of the Internal Affairs statements of Officer Grant, Officer Mabry, and Officer Grelak.  He did not print out the statement of Officer Duker, who was allegedly the main perpetrator of Mr. McNeill's injuries (T. 136).

124.  He had no opinion as to exactly what happened but was just testifying to compare accounts of events with physical and medical evidence (T. 137-138).

125.  He agreed that Dr. Fowler was clear that the injuries he saw were not caused by a punch or punches to the face (T. 138).

126.  He agreed that the only person whoever alleged that Mr. McNeill was punched in the face was Mr. McNeill (T. 138).  He had never spoken to Mr. McNeill (T. 138).

127.  He had not had full time government employment as a Medical Examiner since October of 2003 when he was forced to leave the Office of the Chief Medical Examiner of the District of Columbia.

128.   There were complaints of sexual harassment and racial discrimination filed against him by members of that Office, including other pathologists (T. 143-145).  There were five complainants who filed complaints with the EEOC (T. 148).

129.   He attributed the soft tissue swelling on the left side parietal area of Mr. McNeill's head to Mr. McNeill being kicked in the head (T.149-150).

130.   Dr. Arden testified to a non-existent injury to the left parietal area of Mr. McNeill's head.

131.   That testimony undermines all of his other opinions.

### Ashok Krishnaswamy, M.D.

132.   Dr. Ashok Krishnaswamy performed arthroscopic surgery on Mr. McNeill for a partial tear of the anterior cruciate ligament on June 10, 2010 while Mr. McNeill was incarcerated (Direct examination of Dr. Ashok Krishnaswamy, November 13, 2012, T.174, 177, 179).

133.   He performed a second surgical intervention on May 19, 2011.  The second surgery occurred after Mr. McNeill returned back to the infirmary at the institution when he fell and hurt his knee again (*Id*. at 177-178).

134.   This second incident resulted in Mr. McNeill filing a lawsuit against numerous individuals in the case captioned, Bobbie McNeill v. Warden John Wolf, Civil No. WDQ 10-3116.  By Order dated September 7, 2011, a number of the Defendants were either granted summary judgment or were dismissed from the

case (Document 32). By Order dated October 19, 2011, the cause of action was dismissed without prejudice pursuant to Local Rule 102.1.b.iii (Document 34).

135. Dr. Krishnaswamy testified that if Mr. McNeill had an anterior cruciate ligament with a fall, he would have had difficulty standing up and running quickly. He could run, but not quickly (*Id*. at 188).

136. Mr. McNeill told Dr. Krishnaswamy that he got hurt when he was being arrested, but did not tell him that he had twisted his knee when he got out of his car (Cross examination of Dr. Ashok Krishnaswamy, November 13, 2012 at T.189).

137. He could not decipher which of several reasons caused the anterior cruciate ligament tear (*Id*. at 190).

138. During his deposition he testified that he was "not sure" whether the ACL tear was caused by Mr. McNeill twisting his knee when he jumped out of the car or from being kicked in the knee (*Id*. at 191-192).

139. He answered "Yes" to the following question: "So you don't know what physical force, the twisting, getting out of the car, falling down or being kicked, any one of those things could have caused that injury. Correct?" (Recross examination of Dr. Ashok Krishnaswamy, November 13, 2012 at T. 196).

**Kenneth B. Tepper, M.D.**

135.   Dr. Tepper's video-taped deposition of October 26, 2012 was played during the Defendants' case.   The certified video recording was admitted as Defendants' Exhibit No. 33, together with his curriculum vitae (Defendants' Exhibit 31), and his report of independent medical examination (Defendants' Exhibit 32).   The transcript of his deposition was marked as Defendants' Exhibit 34.  Dr. Tepper testified as follows:

Q.    All right, now based upon your review of the records and your exam of Mr. McNeill and the history you took, have you formulated any opinions within a reasonable degree of medical certainty?

A.    Yes.  I have.

Q.    And what are those opinions?

A.    My opinion is that Mr. McNeill sustained a tear of the anterior cruciate ligament upon exiting his vehicle, running and twisting his knee and falling.   That is the most common mechanism for injury or the most common reason why the anterior cruciate ligament tears.

Q.    Because of what?

A.    Because of a twisting injury to the knee.

Q.    All right, and did you formulate any other opinions?

A.    That any of the other issues, as far as what other damage may have been caused from being kicked in the knee, my opinion was that that would have been expected at most to have caused any type of contusion or bruise, rather than injury to the anterior cruciate ligament or meniscus.

Q.    All right.  Now are you saying that you know for a fact that he was kicked in the knee?

A.    I do not know, based on what he has told me.

(Transcript of video-taped deposition of Kenneth B. Tepper, M.D., taken on October 26, 2012, Defendants' Exhibit 34 for identification, at p.18-19)

### David Fowler, M.D.

139.   The Defendants called David R. Fowler, M.D. as an expert in forensic pathology. Dr. Fowler is the Chief Medical Examiner for the State of Maryland (Defendant's Exhibit 44 for ID, at 6, 15).  He has been Chief Medical Examiner for 10 years (Id. at 13).

140.   His *curriculum vitae* was admitted into evidence as Defendants' Exhibit 41.  His written report on Bobbie McNeill was admitted as Defendants' Exhibit 42.  A certified video-recording of November 5, 2012 was admitted as Defendants' Exhibit 43.   The transcript of his Deposition was marked for identification as Defendants' Exhibit 44.

141.   Dr. Fowler reviewed numerous documents and photographs, including numerous photographs in multiple formats, statements from police officers, the report of Dr. Jonathan Arden, deposition of Dr. Jonathan Arden, deposition of Bobbie McNeill, medical records from Franklin Square Hospital, Baltimore County Detention Center, Baltimore Medical Systems and Bon Secours Hospital,

Answers to Interrogatories and the Internal Affairs Case book (Defendant's Exhibit 44, at 17-19)

142.    Based upon his review of the information, he was able to formulate an opinion to a reasonable degree of medical certainty concerning the causation of Mr. McNeill's injuries.  He testified as follows:

Q.    Any what are those opinions?

A.    The injuries that he sustained are largely to the right-hand side of his face, the right-hand side of his forehead, the right cheek, a little bit down the right side of his nose.  And this actually covers a large area, especially the protuberant parts of the cheek bone and the eyebrow right and the forehead.  And these are places which we would classically see injured when someone lands on their fact on a relatively level surface.

Q.    What is your understanding of what the officers related regarding Mr. McNeill being on a fence?

A.    There was a fence described that he was either up against the fence or attempting to climb over the fence, something of that nature.  And they pulled him off.  He was holding onto that, pulled him off the fence and he went down to the ground.  One of the officers describes him striking his face hard on the pavement.  I think a watermelon-type sound was the description used in one of the officer's statements.

Q.    Do you have an opinion as to whether or not that statement regarding the face and head of Mr. McNeill hitting the alley surface is consistent with what you were describing in terms of the – just describing in terms of the injury that you observed in the photographs?

A.    Absolutely, completely consistent with that (Id.  at 21-22).

143.   Dr. Fowler went on in his testimony to discuss the photographs

of Mr. McNeill's injuries.  He testified:

Q.    And now with respect to the injury to the eye, the right eye, do
you have an opinion to a reasonable degree of medical certainty
as to the cause of that injury?

A.    Yes.

Q.    And what is that opinion?

A.    That is him contacting some hard object.  If I look at the –
And you are singling out just the laceration?

Q.    I'm singling out the whole injury.

A.    Okay.  The whole injury because it is a complex injury is what
gives you what this is.

                    *   *   *

This is largely gravel rash with a laceration in the middle.

Q.    Is that - - is gravel rash different from road rash?

A.    It's the same thing.

Q.    So what is your opinion to a reasonable degree of medical
certainty as to the cause of that complex that you described?

A.    Within a reasonable degree of medical certainty this individual
struck a rough, relatively flat object.

Q.    And were you familiar with Mr. McNeill's version of how he
sustained that injury to that right eye area?

A.    I believe he was stated he was punched in that area.

Q.   Is the injury that you have described and that you have just rendered an opinion on consistent with Mr. McNeill's statement that he sustained the injury by being punched in the eye?

A.   Could a punch to that eye brow ridge have caused a laceration like that? Yes.  But it would not cause any of the other injuries? So, therefore, when I look at the entire complex, this is much more consistent with an impact on a rough surface than a punch? (Id. at 26-28).

144.   He testified that this was "entirely consistent with the statements made by multiple officers" (Id. at 29).

145.   With respect to the injury to the top of the head, he noted: "The CT scan did not document anything in the right parietal area.  They did say they saw some soft tissue swelling on the left parietal area, but the obvious injury that can be seen was not documented by the CT scan" (Id.).

146.   Dr. Fowler concluded that "the individual who read the scan did what is a very common mistake … and got the left and right mixed up" (Id. at 31).

147.   With respect to the laceration on the right parietal scalp, that injury was sustained when Mr. McNeill struck his head on the edge of the door frame as he was entering the police vehicle. There were no surrounding abrasions tending to preclude any broader, wider object (Id. at 31-32).  He also testified that the right parietal laceration was not consistent with Mr. McNeill's allegation that he had been kicked in the head by one of the officers.

A.    No.  This is not consistent with a shoe-type impact.  It's too short, it's too narrow and has no surrounding abrasions which are the hallmarks that I would expect to see from either the sole or even the front edge or toe part of a shoe or boot (*Id.* at 33).

### Additional Factual Findings

148.   Dr. Krishnaswamy's testimony failed to meet the standard of medical probability sufficient to prove that the alleged kicking of Mr. McNeill's knee was the cause of any injury to the knee.  He admitted that the twisting of Mr. McNeill's knee when he got out of the car could have caused the tear of the ACL.

149.   This testimony is contrasted with the credible testimony of Dr. Tepper, who testified that Mr. McNeill sustained an ACL tear upon exiting his vehicle, and twisting his knee.

150.   The McNeill deposition was read into evidence and clearly showed a number of false statements by Mr. McNeill, including his statement that he could not remember where he had been prior to the incident.  Kevin Seglinski made it clear that they had been to bars, had been drinking and had smoked marijuana.

151.   In his deposition testimony under oath, Mr. McNeill included Officer Hays as one of the officers who had struck and beat him, but he then apparently changed his position at trial when Officer Hays was dismissed with prejudice from the case.

152.    With regard to Mr. McNeill's credibility, he has numerous convictions on his certified record (Defendants' Exhibit 50) that establish his character for lack of truthfulness under Fed. R. Evid. 609.

153.    There were also several examples of McNeill's manipulative character: (a) his claim that he had chest pains so that he would be taken to Franklin Square Hospital and (2) his claim at Franklin Square Hospital that if he did not get his Percocet and Xanax that he would hear voices and become suicidal. Dr. McCloskey noted in the hospital records that Mr. McNeill was manipulative (Defendants' Exhibit 7 at P00003).

154.    Dr. David Fowler, the State Medical Examiner, testified that the radiologist who read the CT Scan at Franklin Square Hospital transposed right and left (Defendants' Exhibit 7 at P00012).  This error was the basis upon which Dr. Arden testified to a non-existent injury in the left parietal area.  This erroneous testimony by Dr. Arden undermines his entire opinion, because he testified that he considered all the injuries in order to formulate his ultimate opinion.  The diagram that McNeill completed showed injuries only to the right side of the head (Defendants' Exhibit 6 at A-9 & A-10) and his interview also revealed the same. The records at the Detention Center confirm this as well (Defendants' Exhibit 6 at D-23-24).

155.  Dr. Arden's testimony was also discredited based upon the fact that he was a hired expert and that he had been terminated as Chief Medical Examiner for the District of Columbia because of claims of racial discrimination and sexual harassment.

156.  Kevin Seglinski, Mr. McNeill's best friend since the age of 13, credibly testified that he did not see any of the officers beat, kick or hit Mr. McNeill.

157.  Mr. McNeill blamed everything on Officer Duker in his original complaint to Internal Affairs, but there was abundant, undisputed evidence at trial to show that Officer Duker did not arrive until Mr. McNeill was already on the ground and was resisting arrest.  Officer Duker only assisted in the handcuffing of Mr. McNeill by Officer Weaver.

158.  Another false statement by Mr. McNeill was his allegation that Officer Rayner, who processed him, told him that it was Officer Duker that had beaten him.  Officer Rayner testified without any contradiction that this was not true.

159.  Officer Duker credibly testified that the only way Mr. McNeill learned his name was when McNeill saw his name plate as he was being brought in from the Sally Port into the Precinct.

160.  Sergeant Mullaney testified that the Internal Affairs investigation

concluded that all the charges against the officers were unfounded. That finding was confirmed by the evidence at trial.

161.   The testimony of Officer Grant and the other Officers was highly credible.   The recording of the police chase and the written transcripts of that chase, as well as other radio transmissions, confirm in every respect the testimony of Officer Grant and the other officers and the fact that the Officer acted completely professionally throughout the course of their contact with Mr. McNeill.

162.   The records from Franklin Square Hospital confirm that there were no reported injuries to the left parietal area (Defendants' Ex. 7).

163.   In his deposition and in his submissions to Internal Affairs, Mr. McNeill stated that it was Officer Grant who had handcuffed him.   Officer Grant flatly denied this and it was clear from the testimony and other evidence that it was Officer Weaver who cuffed Mr. McNeill after he had been pulled off the fence.   This was pointed out in the Internal Affairs investigation and confirmed in the radio transmissions when Officer Weaver requested someone to make sure he got his cuffs back.

164.   Officer Grant injured her wrist during the fracas and was unable to cuff Mr. McNeill herself.

165.   Sergeant Mullaney credibly testified that he was unable to locate any witnesses who had seen the incident or who could confirm in any way what

Mr. McNeill had alleged. The only witnesses to the incident were the Officers, Seglinski and McNeill. Everyone but Mr. McNeill denied that the officers had struck, beat or kicked McNeill. Thus, the only person who made those allegations is Mr. McNeill. As noted above, his allegations are not credible and are contradicted by all the other evidence in the case.

166. McNeill was apprehended behind 1885 Church Road which is the home of Carol Dix. 1885 Church Road, as shown in the photographs submitted by the County (Defendants' Exhibit 55), is approximately 80 feet from the entrance of the alley from Cavanaugh Road. There is also a diagonal fence behind 1885 Church Road which is the fence which Officer Grant and the other Officers identified as being the one to which Mr. McNeill attached himself.

167. The Officers all testified credibly that Officer Grant chased Mr. McNeill down the alley. Officer Grelak then arrived to assist, followed shortly thereafter by Officer Mabry. Officer Weaver then arrived and then Officer Duker who assisted Officer Weaver in putting the handcuffs on McNeill by placing his knee in the shoulder of Mr. McNeill. After Mr. McNeill was handcuffed, the Officers started to take him back to the car when they were met by Officer Hays who took primary responsibility for attempting to put Mr. McNeill into the police vehicle. He scratched a knuckle on her left hand in the process of resisting her attempts to place him in the police vehicle. There was also uncontroverted

testimony that McNeill broke the antenna off Officer Grant's vehicle. That was the reason why a wagon had to be used to transport Mr. McNeill back to the precinct.

168.   Mr. McNeill revealed his true motives in this matter when he was returned to the precinct and met with Officer Grant. At first he was joking with her, but when she indicated that she did not think the whole situation was funny, he berated her with expletives and pointed to his right eye saying that this was going to be his "fucking payday."

169.   A number of the Officers also testified that their impression of Mr. McNeill was that he was trying to put on a show, hoping that neighbors would be watching and that he would possibly use them in subsequent proceedings against the Officers. When there were citizens nearby, he would put on a show, but when there was no one there, he ceased putting on a show.

170. Mr. McNeill twisted his left knee when he bailed out of his vehicle. The injury to his left knee was caused by that twisting.

171. Officer Grant did not handcuff Mr. McNeill as Mr. McNeill alleged.

172. Mr. McNeill violently resisted the Defendants' attempts to arrest and handcuff him.

173. The injury to the right eye area of Mr. McNeill's face occurred when Officers Grant, Grelak, Mabry and Weaver pulled Mr. McNeill off of the diagonal fence in the alley and the right side of Mr. McNeill's hit the surface of the alley.

174. The injury to the right side of Mr. McNeill's face was not caused by Officer Duker or any other Officer punching Mr. McNeill, as Mr. McNeill alleged.

175. Officer Duker assisted the other Officers in placing handcuffs on Mr. McNeill. He had no other involvement with Mr. McNeill and left the scene to assist in an unrelated narcotics investigation.

176. Officer Weaver placed his handcuffs on Mr. McNeill after Mr. McNeill was pulled off of the fence. This was confirmed by the police radio transmissions played at trial.

177. Officer Grant injured her wrist during the struggle to arrest Mr. McNeill.

178. After he was cuffed, Mr. McNeill continued to resist Officer Hays and caused an injury to her hand.

179. The laceration to the right parietal area of Mr. McNeill's head resulted from his head striking the frame of Officer Grant's patrol vehicle (by Mr. McNeill's own admission) as the Officers attempted to place him in the vehicle and he continued to resist; it did not result from any Officer kicking Mr. McNeill in the head.

180. Mr. McNeill broke the aerial off of Officer Grant's patrol vehicle and had to be transported in a prisoner wagon because of the way he was acting.

181. There was no injury to the left parietal area of Mr. McNeill.

182.  Dr. Arden testified to a non-existent injury to the left parietal area.

183. Officer Robert Rayner, the booking Officer, did not tell Mr. McNeill that it was Officer Duker who had assaulted him, as alleged by Mr. McNeill.

## C.    APPLICABLE LAW

Mr. McNeill originally brought two causes of action, one under 42 U.S.C. §1983 and one for Battery under Maryland's common law. His father, Bobbie McNeill, Sr. (who will be referred to as "the Plaintiff"), as Personal Representative, has now brought an additional survival action due to McNeill's death from heroin and cocaine intoxication as set forth in a Third Amended Complaint. That death has no relationship to the claims in this case. The Plaintiff, at all times, had the burden to prove each and every element of these three causes of action by a preponderance of the evidence.

42 U.S.C. §1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, ….

In order to establish a claim under 42 U.S.C. §1983, the Plaintiff must prove (1) the denial under color of state law(2) of a right secured by the Constitution and laws of the United States. *McIver v. Russell*, 264 F.Supp. 22, 31 (D. Md. 1967).

There is no dispute that the Officers were acting under color of state law. The

Officers deny that there was a denial of any rights secured by the Constitution.

### 1.    An officers' use of force must be objectively reasonable as a matter of law.

The seminal case for assessing the validity of a police officer's use of force

is *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865 (1989), which focuses on the

"objective reasonableness" of the officer's conduct:

> [t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving- - about the amount of force that is necessary in a particular situation.

*Id.* at 396.

> The Fourth Circuit has instructed that:

> courts determining whether an application of force is objectively reasonable must consider " 'the totality of the circumstances,' "which includes (1) the severity of the crime issue, (2) whether the suspect posed an immediate threat to the officer or others, and (3) whether the suspect was attempting to resist or evade arrest. *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). With all of the relevant circumstances before it, a court may then properly balance an individual's Fourth Amendment interests and the Government's countervailing law enforcement concerns.

*Henry v. Purnell*, 619 F.3d 323, 331 (4th Cir. 2010).

A police officer is justified in using even deadly force if they have "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001) Furthermore, "[t]he court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996); s*ee also, Greenidge v. Ruffin*, 927 F.2d 789 (4th Cir. 1991) (same).

In this case, the Officers were justified in applying the force they used to detain and arrest McNeill and there was no credible evidence that they acted maliciously or sadistically to cause harm to Mr. McNeill.

### 2.  Qualified Immunity.

"Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.' *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)."

Further, because "qualified immunity is an entitlement not to stand trial or face the other burdens of litigation . . . rather than a mere defense to liability," the trial court should "resolve immunity questions at the earliest possible stage in the

litigation." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (internal quotation and citation omitted). Ordinarily this is at the summary judgment stage. *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005).

In the case at bar, even if the Court finds that any of the Officers violated the Constitution, the Defendants respectfully submit that such a violation would have to be deemed to have occurred in the "gray area" in which immunity would shield them. Although McNeill was injured during his detention and arrest, the officers were forced to make split second decisions about how to detain and arrest him. It is again respectfully submitted that they did not "transgress any bright lines," and they are therefore entitled to qualified immunity, if they are not entitled to judgment on the merits.

### 3. Maryland common law Battery claim.

Based on the above reasoning with respect to the federal constitutional claims, the Plaintiff's common law battery is also legally deficient. In *Richardson v. McGriff*, 361 Md. 437 (1999), a police shooting case, the Court of Appeals expressly adopted the reasoning and holding of *Graham v. Connor* and its progeny, holding that "[t]hat principle, announced in the context of a § 1983 claim for the violation of Federal Constitutional rights, is the appropriate one to apply as well to petitioner's claim under Article 26 of the Maryland Declaration of Rights and the common law claims of battery and gross negligence." *Id.* at 452.

The requirements for establishing a battery under state law are set forth in MPJI-CV 15:2 to 15-5. Of particular importance in this case is Instruction 15:5:

> A police officer is not responsible if he or she inflicts an injury on a person who is being arrested, unless the officer acts with malice toward that person. Malice exists when the officer intends to inflict an injury or acts from improper motivations or with ill will.

### 4. Survival Claim.

Based on the above reasoning with respect to the federal constitutional claim and battery claims, the Plaintiff's statutory survival claim is also legally deficient. Moreover, Plaintiff failed to prove that Mr. McNeill's injuries were caused in the manner claimed by Mr. McNeill.

In addition, the survival action is time barred, because it was not brought with 3 years of the date it accrued, January 16, 2009. *See Georgia-Pacific Corp. v. Benjamin*, 394 Md. 59, 95-96, 904 A.2d 511, 532-533 (2006); *Philip Morris USA, Inc. v. Christensen*, 394 Md. 227, 266, 905 A.2d 340, 363 (2006).

### D. PROPOSED CONCLUSIONS OF LAW

1. The Plaintiff failed to prove by a preponderance of evidence that the Defendants violated 42 U.S.C. §1983 (Count I), that they committed a common law battery (Count II), or that there was any entitlement to recover damages on behalf of the Estate of Bobbie McNeill, Jr. (Count III) from the Defendants.

2.  Officer Grant had probable cause to make a traffic stop of the vehicle driven by Mr. McNeill after it went the wrong way on a one-way street.

3.  The Defendants were justified in pursuing Mr. McNeill's vehicle after he fled from the traffic stop.

4.  Officers Grant, Grelak and Mabry were justified in chasing Mr. McNeill down the alley and attempting to arrest him.

5.  The Officers used only such force as was necessary to overcome Mr. McNeill's resistance in order to effectuate his arrest.

6. In the totality of the circumstances, the Defendants' use of force to apprehend and arrest Mr. McNeill was objectively reasonable as a matter of law. Mr. McNeill had fled from a legally-valid traffic stop, led the Officers on a dangerous vehicular chase through a residential area, attempted to flee of foot, posed an immediate threat to the safety of its Officers,  may have been armed, violently resisted arrest, and actually injured Officers Grant and Hays.

7. The Officers were justified in using force to pull Mr. McNeill off of the fence in the alley, to handcuff him, and to attempt to place him in Officer Grant's patrol vehicle. None of this force was excessive, wanton, malicious, or sadistic as a matter of law.

8. The Defendants are entitled to judgment as a matter of law as to Count I.

9.  The Defendants did not act with malice toward Mr. McNeill, they did not intend to inflict injury upon Mr. McNeill, and they did not act from improper motivation or with ill will. They are therefore entitled to judgment as a matter of law as to Count II.

10. The Plaintiff failed to prove that the injury to Mr. McNeill's right eye was caused by his being punched by Officer Duker.

11. The Plaintiff failed to prove that the injury to Mr. McNeill's left knee was caused by his being kicked by Officer Duker.

12. The Plaintiff failed to prove that the injury to the right parietal area of Mr. McNeill's head was caused by his being kicked by any of the Officers.

13. The Plaintiff failed to prove that there was any injury to the left parietal area of Mr. McNeill's head as stated by his forensic expert, as all other evidence, including that coming from Bobbie McNeill's own statements, confirmed that there was no injury to the left parietal area.

14. Plaintiff failed to prove that Mr. McNeill was entitled to recover any damages for the injuries Mr. McNeill allegedly sustained on January 16, 2009.

15. The Plaintiff failed to prove that any injury sustained by Mr. McNeill was caused by any intentional act of the Defendants.

16. The Plaintiff failed to establish by a preponderance of evidence that any of his injuries were caused by the Defendants.

17. The Defendants are entitled to judgment as a matter of law on Count III.

## Conclusions of Law as to Defendants' Defenses

18.  There was legal justification to arrest and detain the Mr. McNeill.

19. There was probable cause to arrest and detain Mr. McNeill.

20.  Having reviewed all of the evidence, the Court has reconsidered it earlier ruling and now finds that Mr. McNeill's claims are barred by the doctrine of judicial estoppel based on his guilty plea in the Circuit Court for Baltimore County on September 30, 2009.

Respectfully submitted,

/s/

_____
James J. Nolan, Jr.
Jordan V. Watts, Jr.
Baltimore County Office of Law
400 Washington Avenue, Room 219
Towson, Maryland 21204
(410) 887-4420
jnolan@baltimorecountymd.gov
jwatts@baltimrecountymd.gov
*Attorneys for Defendants*

**Electronically Filed:  March 8, 2013**